IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:17-CR-289 |
| | ) | |
| v. | ) | Count 1: 18 U.S.C. § 1349 |
| | ) | (Conspiracy to Commit Wire Fraud) |
| FAROUK M. AHMED, and | ) | |
| RAJESH H. KOTHARY, | ) | Counts 2 - 11: 18 U.S.C. § 1343 |
| | ) | (Wire Fraud) |
| Defendants. | ) | |
| | ) | Forfeiture Notice |

## **INDICTMENT**

December 2017 Term - at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

### **GENERAL ALLEGATIONS**

Unless otherwise noted, at all times relevant to this indictment:

1.     The Centech Group, Inc. ("Centech") was a corporation based in Arlington, Virginia, and subsequently in Falls Church, Virginia, both within the Eastern District of Virginia, that provided program management and other services to various agencies of the United States government.

2.     Defendant FAROUK M. AHMED ("AHMED") was an employee of Centech who worked at Centech's headquarters in Arlington, Virginia, and subsequently in Falls Church, Virginia, both within the Eastern District of Virginia.  AHMED worked within the information technology department of Centech.  As its employee, AHMED owed a fiduciary duty to Centech.

3.     NextGen Solutions, Inc. ("NextGen") was a corporation formed under the laws of the State of Maryland by defendant RAJESH H. KOTHARY ("KOTHARY") in or around 2002.

No later than 2005, NextGen had no customers and was not providing goods or services of any kind to any party.

4.    Ayman Mohamed Aly Tohami Farag, also known as "Ayman Tohami," (hereinafter "Tohami"), was employed as a chauffeur. Tohami had no training, certifications, specialized knowledge, or formal education regarding computers, computer equipment or accessories, software, information technology systems, or related subjects.

5.    Farrah Enterpices LLC ("Farrah") was a limited liability company formed under the laws of the Commonwealth of Virginia by Tohami in or around 2008. Farrah conducted no actual business, had no customers, and did not provide goods or services of any kind to any party.

6.    Cyber-Tek Inc. ("Cyber-Tek") was a corporation formed under the laws of the Commonwealth of Virginia by Tohami in or around 2010. Cyber-Tek conducted no actual business, had no customers, and did not provide goods or services of any kind to any party.

## COUNT 1

(Conspiracy To Commit Honest Services Wire Fraud and Money and Property Wire Fraud)

7.      Paragraphs 1 through 6 of this Indictment are re-alleged and incorporated in this Count as if fully set forth herein.

8.      Beginning no later than 2002, and continuing through at least August 2013, in the Eastern District of Virginia and elsewhere,

FAROUK M. AHMED, and
RAJESH H. KOTHARY,

defendants herein, along with Ayman Mohamed Aly Tohami Farag, also known as "Ayman Tohami," and others known and unknown to the grand jury, did knowingly conspire and agree with each other, and others known and unknown to the grand jury, to commit certain offenses against the United States, namely:

        a.      knowingly to devise and intend to devise a scheme and artifice to defraud by depriving another of the intangible right of honest services through kickbacks, and for the purpose of executing such scheme to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346;

        b.      knowingly to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## NATURE AND PURPOSES OF THE CONSPIRACY

The nature and purposes of the conspiracy included the following:

9.      It was a purpose and object of the conspiracy for AHMED, KOTHARY, and

Tohami to enrich themselves by defrauding Centech through submitting materially false and

fraudulent invoices for goods and services purportedly delivered or provided to Centech that, as

the co-conspirators knew, had not in fact been delivered or provided, thereby causing Centech to

issue checks to pay for these non-existent goods and services, and thereafter for the

coconspirators to divide the proceeds of the conspiracy among themselves, as described in more

detail below.

10.     It was further a purpose and object of the conspiracy for the co-conspirators to

arrange to pay kickbacks to AHMED out of the funds paid from Centech to entities controlled by

KOTHARY and Tohami, in return for AHMED ensuring that additional payments were routed

from Centech to the entities controlled by KOTHARY and Tohami, as described in more detail

below.

## MANNER AND MEANS OF THE CONSPIRACY

11.     In furtherance of the conspiracy, and to accomplish its unlawful objects, the

following methods and means were used, among others:

12.     The co-conspirators created shell entities with no legitimate operations, or used

dormant entities that were no longer conducting any significant business, and falsely held these

companies out as vendors who were providing goods or services to Centech. These entities

included NextGen, Farrah, and Cyber-Tek.

13.     The co-conspirators also assigned various trade names to their shell or dormant

entities. The co-conspirators employed these trade names to mask the fact that multiple

seemingly unrelated transactions all involved the same entity, and to give the false impression

that these entities provided goods or services related to computers, information technology, or

related technical fields.  For example, AHMED and Tohami decided to use the names "IT

Solutions" and "Micro IT" as trade names assigned to Farrah.  Likewise, AHMED and Tohami

decided to use the names "Intel Tech World Lead" and "CDW-Tek" as trade names assigned to

Cyber-Tek.

14.    The co-conspirators created and caused to be created materially false and

fraudulent invoices that purported to be issued by various companies (or using the various trade

names of companies) that they controlled.  The materially false and fraudulent invoices were

addressed to and sought payment from Centech for computers, software, computer-related

equipment and supplies, information-technology related services, and computer-related training

that the companies allegedly had supplied to Centech.  In several instances, the co-conspirators

created false and fictitious invoices that contained deliberately vague or obscure descriptions of

the alleged goods or services that had been or would be provided, or referred to highly technical

goods or services relating to information technology, the fraudulent nature of which would not

be readily apparent to a layperson.  As the co-conspirators well knew, the invoices were false and

fraudulent in that no such goods or services actually had been or would be provided by the co-

conspirators or the entities controlled by the co-conspirators.

15.    AHMED presented and caused to be presented the materially false and fraudulent

invoices to his coworkers at Centech as legitimate invoices for goods or services actually

received by Centech, in order to induce Centech to issue payment for the materially false and

fraudulent invoices.

16.     AHMED sought to circumvent Centech's internal controls regarding the approval and payment of invoices so as to prevent detection of the fraud. For example, Centech's internal procedures typically required that when its employees sought to purchase an item from a vendor, the employee obtain approval either from their supervisor, or from the manager overseeing the business unit that was incurring the expense in question. Typically, the supervisor's or manager's approval would be documented by their signing an internal Centech purchase requisition form. AHMED frequently sought to bypass these procedures in several ways:

a.      In several instances, AHMED deliberately bypassed the supervisor at Centech who was responsible for overseeing and therefore the most knowledgeable regarding the company's information technology systems. Instead, AHMED frequently sought approval from managers who were less knowledgeable regarding the information technology aspects of Centech's business, and therefore were less likely to recognize the fraud.

b.      In other instances, AHMED forged managers' signatures on purchase requisition forms that they had not in fact authorized.

c.      In other instances, AHMED used old purchase requisition forms that had been signed by a Centech supervisor for an unrelated purchase, created an altered copy of the signed form, and then fraudulently passed off the doctored form as authorizing a new, fraudulent purchase, when the new purchase had not in fact been authorized.

17.     AHMED, based on the presentation of the materially false and fraudulent invoices for non-existent goods or services, obtained checks issued by Centech made payable to the shell

or dormant entities, or the trade names associated with those entities, that were controlled by the co-conspirators.

18.     After obtaining these checks, in some instances AHMED would meet KOTHARY or Tohami in person to deliver the checks that had been fraudulently issued to the entities controlled by the co-conspirators. In other instances, AHMED would arrange to deposit the checks directly into accounts controlled by KOTHARY or Tohami.

19.     KOTHARY and Tohami would keep a percentage of the money from the checks fraudulently obtained from Centech and kick back the remainder of the funds to AHMED.

20.     KOTHARY frequently paid AHMED his portion of the fraud proceeds by withdrawing AHMED's share of those proceeds in cash after the funds from the checks issued by Centech had been credited to the bank accounts controlled by KOTHARY. KOTHARY would then deposit AHMED's share of the fraud proceeds in cash into an account controlled by AHMED. KOTHARY and AHMED agreed to conduct and conducted these transactions in cash to conceal their involvement in the scheme, and to mask the fact that the money being deposited into AHMED's account was proceeds of the fraud kicked back to him from KOTHARY.

21.     In other instances, KOTHARY would arrange to pay AHMED his portion of the fraud proceeds by writing a check made payable to AHMED's live-in girlfriend, who held a joint checking account with AHMED. When writing checks made payable to AHMED's live-in girlfriend, KOTHARY frequently would include false memo lines referring to invoices or goods that did not exist, to mask the true nature of the payments as kickbacks in furtherance of the fraud.

22.     KOTHARY created false and fraudulent tax returns for NextGen, with fabricated entries for items such as the cost of goods sold and business expenses, to make it appear that

NextGen was a legitimate vendor engaged in actual business. In fact, as KOTHARI well knew, by no later than 2005, NextGen had no customers and was not providing goods or services of any kind to any party.

23. It was a further part of the conspiracy that, for the purpose of executing the scheme to defraud, AHMED, KOTHARY, and Tohami transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds.

24. It was further part of the conspiracy that AHMED, KOTHARY, and Tohami sought to conceal the true nature of and their participation in the fraud.

## CONDUCT IN FURTHERANCE OF THE CONSPIRACY

25. In furtherance of the conspiracy, and to effect the objects thereof, the co-conspirators took the following actions within the Eastern District of Virginia and elsewhere:

26. On or about November 26, 2012, at Falls Church, within the Eastern District of Virginia, AHMED presented and caused to be presented to Centech a materially false and fraudulent document purporting to be invoice number 3260 from NextGen for services allegedly delivered or to be delivered to Centech. As AHMED knew, NextGen had not provided and would not provide any of the services identified in this fraudulent invoice. AHMED nonetheless caused Centech to pay this fraudulent invoice by issuing a check made payable to NextGen in the amount of $8,506.04.

27. On or about November 29, 2012, at Falls Church, within the Eastern District of Virginia, the co-conspirators deposited check number 95523 from Centech made payable to NextGen in the amount of $8,506.04 into an account at Capital One, N.A., controlled by

KOTHARY, knowing that neither NextGen, KOTHARY, nor any company that KOTHARY owned or controlled had provided any goods or services to Centech to earn that payment.

28.    On or about November 30, 2012, KOTHARY withdrew approximately $4,500 in cash from an account at Capital One, N.A. bank account that he controlled, knowing that this cash represented proceeds of the scheme to defraud.

29.    On or about November 30, 2012, KOTHARY deposited approximately $3,900 in cash into a Capital One, N.A. bank account controlled by AHMED, knowing that this cash represented proceeds of the scheme to defraud.

30.    On or about December 3, 2012, KOTHARY withdrew approximately $3,976 in cash from an account at Capital One, N.A. bank that he controlled, knowing that this cash represented proceeds of the scheme to defraud.

31.    On or about December 3, 2012, KOTHARY deposited approximately $3,776 in cash into a Capital One, N.A. bank account controlled by AHMED, knowing that this cash represented proceeds of the scheme to defraud.

32.    On or about December 10, 2012, at Falls Church, within the Eastern District of Virginia, the co-conspirators deposited approximately $2,000 in cash into a Capital One, N.A. bank account controlled by AHMED, which cash represented proceeds of the scheme to defraud.

33.    On or about December 11, 2012, at Falls Church, within the Eastern District of Virginia, the co-conspirators deposited approximately $2,000 in cash into a Capital One, N.A. bank account controlled by AHMED, which cash represented proceeds of the scheme to defraud.

34.    On or about December 11, 2012, at Falls Church, within the Eastern District of Virginia, AHMED presented and caused to be presented to Centech a materially false and fraudulent document purporting to be invoice number 3261 from NextGen for goods allegedly

delivered or to be delivered to Centech. As AHMED knew, NextGen had not provided and would not provide any of the goods identified in this fraudulent invoice. AHMED nonetheless caused Centech to pay this fraudulent invoice by issuing a check made payable to NextGen in the amount of $6,037.43.

35.     On or about December 13, 2012, at Falls Church, within the Eastern District of Virginia, the co-conspirators deposited check number 95675 from Centech made payable to NextGen in the amount of $6,037.43 into an account at Capital One, N.A., controlled by KOTHARY, knowing that neither NextGen, KOTHARY, nor any company that KOTHARY owned or controlled had provided any goods or services to Centech to earn that payment.

36.     On or about December 17, 2012, KOTHARY withdrew approximately $5,404 in cash from an account at Capital One, N.A. bank that he controlled, knowing that this cash represented proceeds of the scheme to defraud.

37.     On or about December 17, 2012, at Falls Church, within the Eastern District of Virginia, the co-conspirators deposited approximately $3,000 in cash into a Capital One, N.A. bank account controlled by AHMED, which cash represented proceeds of the scheme to defraud.

38.     On or about December 18, 2012, at Falls Church, within the Eastern District of Virginia, the co-conspirators deposited approximately $2,000 in cash into a Capital One, N.A. bank account controlled by AHMED, which cash represented proceeds of the scheme to defraud.

39.     On or about December 20, 2012, at Falls Church, within the Eastern District of Virginia, the co-conspirators deposited approximately $1,600 in cash into a Capital One, N.A. bank account controlled by AHMED, which cash represented proceeds of the scheme to defraud.

40.     On or about December 26, 2012, at Falls Church, within the Eastern District of Virginia, AHMED presented and caused to be presented to Centech a materially false and

fraudulent document purporting to be invoice number 3262 from NextGen for services allegedly delivered or to be delivered to Centech. As AHMED knew, NextGen had not provided and would not provide any of the services identified in this fraudulent invoice. AHMED nonetheless caused Centech to pay this fraudulent invoice by issuing a check made payable to NextGen in the amount of $8,506.04.

41.     On or about December 27, 2012, at Falls Church, within the Eastern District of Virginia, the co-conspirators deposited check number 95813 from Centech made payable to NextGen in the amount of $8,506.04 into an account at Capital One, N.A. controlled by KOTHARY, knowing that neither NextGen, KOTHARY, nor any company that KOTHARY owned or controlled had provided any goods or services to Centech to earn that payment.

42.     On or about December 28, 2012, KOTHARY withdrew approximately $6,800 in cash from an account at Capital One, N.A. bank that he controlled, knowing that this cash represented proceeds of the scheme to defraud.

43.     On or about December 28, 2012, KOTHARY deposited approximately $4,767 in cash into a Capital One, N.A. bank account controlled by AHMED, knowing that this cash represented proceeds of the scheme to defraud.

44.     On or about December 28, 2012, KOTHARY deposited approximately $2,000 in cash into a Capital One, N.A. bank account controlled by AHMED, knowing that this cash represented proceeds of the scheme to defraud.

45.     On or about January 29, 2013, at Falls Church, within the Eastern District of Virginia, the co-conspirators deposited approximately $3,000 in cash into a Capital One, N.A. bank account controlled by AHMED, which cash represented proceeds of the scheme to defraud.

46.     On or about January 31, 2013, at Falls Church, within the Eastern District of Virginia, the co-conspirators deposited approximately $3,000 in cash into a Capital One, N.A. bank account controlled by AHMED, which cash represented proceeds of the scheme to defraud.

47.     On or about February 4, 2013, at Falls Church, within the Eastern District of Virginia, AHMED presented and caused to be presented to Centech a materially false and fraudulent document purporting to be invoice number 3195-13 from NextGen for services allegedly delivered or to be delivered to Centech. As AHMED knew, NextGen had not provided and would not provide any of the services identified in this fraudulent invoice. AHMED nonetheless caused Centech to pay this fraudulent invoice by issuing a check made payable to NextGen in the amount of $6,247.50.

48.     On or about February 6, 2013, at Falls Church, within the Eastern District of Virginia, the co-conspirators deposited check number 96165 from Centech made payable to NextGen in the amount of $6,247.50 into an account at Capital One, N.A. controlled by KOTHARY, knowing that neither NextGen, KOTHARY, nor any company that KOTHARY owned or controlled had provided any goods or services to Centech to earn that payment.

49.     On or about February 8, 2013, KOTHARY withdrew approximately $4,384 in cash from an account at Capital One, N.A. bank that he controlled, knowing that this cash represented proceeds of the scheme to defraud.

50.     On or about February 8, 2013, KOTHARY deposited approximately $4,184 in cash into a Capital One, N.A. bank account controlled by AHMED, knowing that this cash represented proceeds of the scheme to defraud.

12

51.     On or about February 11, 2013, KOTHARY withdrew approximately $1,100 in cash from an account at Capital One, N.A. bank that he controlled, knowing that this cash represented proceeds of the scheme to defraud.

52.     On or about February 11, 2013, KOTHARY deposited approximately $1,300 in cash into a Capital One, N.A. bank account controlled by AHMED, knowing that this cash represented proceeds of the scheme to defraud.

53.     On or about May 1, 2013, at Herndon, within the Eastern District of Virginia, Tohami deposited check number 97009 from Centech made payable to CDW-Tek in the amount of $3,674.54 into an account at TD Bank, N.A., knowing that neither Tohami nor any company that he owned or controlled had provided any goods or services to Centech to earn that payment.

54.     On or about May 15, 2013, at Arlington, within the Eastern District of Virginia, Tohami deposited check number 97155 from Centech made payable to Inteltek – World Lead Technology Services in the amount of $2,834.97 into an account at TD Bank, N.A., knowing that neither Tohami nor any company that he owned or controlled had provided any goods or services to Centech to earn that payment.

55.     On or about June 13, 2013, at Arlington, within the Eastern District of Virginia, Tohami deposited check number 97390 from Centech made payable to Inteltek – World Lead Technology Services in the amount of $8,700.00 into an account at TD Bank, N.A., knowing that neither Tohami nor any company that he owned or controlled had provided any goods or services to Centech to earn that payment.

(In violation of Title 18, United States Code, Section 1349).

13

## COUNTS 2 - 11

### (Wire Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

56.    Paragraphs 1 through 6 of this Indictment are realleged and incorporated by reference as though set forth in full herein.

57.    Beginning no later than 2002, and continuing through at least August 2013, in the Eastern District of Virginia and elsewhere,

FAROUK M. AHMED, and
RAJESH H. KOTHARY,

defendants herein, along with Ayman Mohamed Aly Tohami Farag, also known as "Ayman Tohami," and others known and unknown to the grand jury, did knowingly devise and intend to devise a scheme and artifice to defraud: (a) by depriving another of the intangible right of honest services through kickbacks; and (b) to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

58.    The scheme to defraud is described in paragraphs 9 through 55 of this Indictment, which paragraphs are re-alleged and incorporated as if fully set forth herein.

### Executions

59.    On or about the dates listed below, for the purpose of executing the above-described scheme, in the Eastern District of Virginia and elsewhere, the following defendants transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds, as described below:

14

| Count | Approx. Date | Defendants Charged | Description |
|---|---|---|---|
| 2 | 12/10/2012 | FAROUK M. AHMED, and RAJESH H. KOTHARY | an electronic communication between Capital One, N.A. computers located in Falls Church, Virginia, and servers located outside of Virginia, to credit the deposit of $2,000 cash into a Capital One, N.A. account controlled by AHMED |
| 3 | 12/11/2012 | FAROUK M. AHMED, and RAJESH H. KOTHARY | an electronic communication between Capital One, N.A. computers located in Falls Church, Virginia, and servers located outside of Virginia, to credit the deposit of $2,000 cash into a Capital One, N.A. account controlled by AHMED |
| 4 | 12/17/2012 | FAROUK M. AHMED, and RAJESH H. KOTHARY | an electronic communication between Capital One, N.A. computers located in Falls Church, Virginia, and servers located outside of Virginia, to credit the deposit of $3,000 cash into a Capital One, N.A. account controlled by AHMED |
| 5 | 12/18/2012 | FAROUK M. AHMED, and RAJESH H. KOTHARY | an electronic communication between Capital One, N.A. computers located in Falls Church, Virginia, and servers located outside of Virginia, to credit the deposit of $2,000 cash into a Capital One, N.A. account controlled by AHMED |
| 6 | 12/20/2012 | FAROUK M. AHMED, and RAJESH H. KOTHARY | an electronic communication between Capital One, N.A. computers located in Falls Church, Virginia, and servers located outside of Virginia, to credit the deposit of $1,600 cash into a Capital One, N.A. account controlled by AHMED |
| 7 | 1/29/2013 | FAROUK M. AHMED, and RAJESH H. KOTHARY | an electronic communication between Capital One, N.A. computers located in Falls Church, Virginia, and servers located outside of Virginia, to credit the deposit of $3,000 cash into a Capital One, N.A. account controlled by AHMED |
| 8 | 1/31/2013 | FAROUK M. AHMED, and RAJESH H. KOTHARY | an electronic communication between Capital One, N.A. computers located in Falls Church, Virginia, and servers located outside of Virginia, to credit the deposit of $3,000 cash into a Capital One, N.A. account controlled by AHMED |

| Count | Approx. Date | Defendants Charged | Description |
|-------|--------------|--------------------|-------------|
| 9 | 5/1/2013 | FAROUK M. AHMED | an electronic communication between TD Bank, N.A. computers located in Herndon, Virginia, and a data processing center located outside of Virginia, to credit the deposit of Centech check number 97009 into a TD Bank, N.A. account controlled by Tohami |
| 10 | 5/15/2013 | FAROUK M. AHMED | an electronic communication between TD Bank, N.A. computers located in Arlington, Virginia, and a data processing center located outside of Virginia, to credit the deposit of Centech check number 97155 into a TD Bank, N.A. account controlled by Tohami |
| 11 | 6/13/2013 | FAROUK M. AHMED | an electronic communication between TD Bank, N.A. computers located in Arlington, Virginia, and a data processing center located outside of Virginia, to credit the deposit of Centech check number 97390 into a TD Bank, N.A. account controlled by Tohami |

(In violation of Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE NOTICE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE FOR FORFEITURE, AS DESCRIBED BELOW:

60. Pursuant to Federal Rule of Criminal Procedure 32.2(a), the defendants FAROUK M. AHMED and RAJESH H. KOTHARY are hereby notified that, if convicted of any of the offenses alleged in Counts 1 through 11 of this Indictment, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the Count or Counts of conviction. If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute property, including but not limited to the following:

   a. A sum of money equal to at least $1,765,146.49 in United States currency, representing the amount of proceeds obtained as a result of the offenses.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

A TRUE BILL:

*Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.*

_____
FOREPERSON OF THE GRAND JURY

Dana J. Boente
United States Attorney

By: _____
Matthew Burke
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981